

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-19-2009

# Lin-Zheng v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 07-2135

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Lin-Zheng v. Atty Gen USA" (2009). *2009 Decisions.* Paper 1802.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1802

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2135
_____

GUANG LIN-ZHENG,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent
_____

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. 1:A98-355-391

**Submitted on Initial Hearing En Banc
May 28, 2008**

Before: Scirica, <u>Chief Judge</u>, Sloviter, McKee, Rendell,
Barry, Ambro, Fuentes, Smith, Fisher, Chagares, Jordan,
Hardiman, Weis and Garth, <u>Circuit Judges</u>

(Opinion filed: February 19, 2009)

David X. Feng, Esq.
The Feng & Associates
401 Broadway
Suite 1900
New York, NY 10013-0000
*Attorney for Petitioner*

Thomas H. Dupree, Jr., Esq.
United States Department of Justice
950 Pennsylvania Avenue, N.W.
601 D. Street, N.W.
Washington, D.C.  20530-0000

Richard M. Evans, Esq.
Paul Fiorino, Esq.
Sada Manickam, Esq.
Song E. Park, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044-0000

*Attorneys for Respondent*

Nancy Winkelman, Esq.
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103-0000

*Amicus Curiae*

OPINION

McKee, <u>Circuit Judge</u>

Guang Lin-Zheng petitions for review of an order of the Board of Immigration Appeals affirming the Immigration Judge's final order of removal. The Board rejected Lin-Zheng's claim that he was entitled to relief from removal because he qualified as a "refugee" pursuant to 8 U.S.C. § 1101(a)(42). That claim was based on Lin-Zheng's assertion that his wife, who remains in China, has been subjected to China's coercive family planning policies. In *Sun Wen Chen v. Attorney General*, 491 F.3d 100, 103 (3d Cir. 2007), a divided panel of this court upheld the BIA's decision in *Matter of C-Y-Z-*, 21 I. & N. Dec. 915 (B.I.A. 1997) (*en banc*), in holding that "a husband may qualify for asylum [based] on the well-founded fear that his wife may be persecuted under a coercive population control policy," pursuant to 8 U.S.C. § 1101(a)(42). Thereafter, the Court of Appeals for the Second Circuit rejected the holding of *C-Y-Z-*,

3

in holding that the statute does not "extend automatic refugee status to spouses or unmarried partners of individuals [who are forcibly subjected to coercive family planning measures]." *Lin v. U.S. Dept. of Justice*, 494 F.3d 296, 300 (2d Cir. 2007).

We granted *en banc* consideration of Lin-Zheng's petition for review to reconsider our decision in *Sun Wen Chen*. For the reasons that follow, we now adopt the reasoning of the Court of Appeals for the Second Circuit and overrule the holding in *Sun Wen Chen*.

## I. Factual Background.

Guang Lin-Zheng, a native and citizen of China, entered the United States in 2004, and filed an application for asylum two months after arriving. In that petition, he claimed he was entitled to asylum based on China's coercive birth control policy. He stated that his wife had been forced to have an intrauterine device (IUD) inserted, and that she had been forced to undergo an abortion. According to Lin-Zheng, his wife's

4

treatment in China allowed him to establish his own persecution, thus allowing him to qualify for asylum under the broadened definition of "refugee" contained in amendments to 8 U.S.C. § 1101(a)(42).

## A. Lin-Zheng's Asylum Petition.[1]

According to the allegations in Lin-Zheng's asylum petition, he and his wife were married in a traditional wedding ceremony in China in 1990, before his wife reached the legal

---

[1] Lin-Zheng filed for asylum, withholding of removal, and relief under Article III of the Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment. However, nothing on this record supports a claim that Lin-Zheng was either tortured in China, or that he has a well-founded fear of being tortured if he is returned to China. We will therefore deny Lin-Zheng's petition as to that claim without discussion, and limit our inquiry to Lin-Zheng's claim that he is a refugee. *See Amanfi v. Ashcroft*, 328 F.3d 719, 725 (3d Cir. 2003) ("A petition for protection under the Convention Against Torture differs significantly from petitions for asylum or withholding of removal because the alien need not demonstrate that he will be tortured on account of a particular belief or immutable characteristic."). In addition, since Lin-Zheng must establish he is a "refugee," to qualify for either asylum or withholding of removal, we will simplify by using "asylum" to refer to both claims unless otherwise indicated.

age for marriage under Chinese law. Lin-Zheng's petition also stated that his wife had given birth to a son approximately a year after their marriage. Problems purportedly started four months after their son was born when family planning officials forced his wife to have an IUD inserted and ordered her to undergo an IUD inspection every four months.

In 1991, Lin-Zheng and his wife officially registered their traditional marriage with government authorities. According to Lin-Zheng, they had to pay a fine when they registered their marriage because their child was born too soon after their wedding to comply with China's family planning policy.[2]

In 2003, the couple arranged for a private doctor to

---

[2] According to the United States Department of State: "[t]he minimum age for marriage in China is 22 for males and 20 for females. . . . Persons who marry before the stipulated age generally are not allowed to register the marriage or obtain a notarized certificate of marriage." A.R. 162. In his asylum petition, Lin-Zheng stated: "because we gave birth before marriage and married and gave birth early, [my wife and I] were fined 50RMB and 100RMB respectively when we went to register our marriage." A.R. 296.

remove the IUD. Thereafter, Lin-Zheng's wife again became pregnant, and went into hiding to avoid family planning officials. Lin-Zheng claimed that family planning officials eventually found his wife when she was approximately six months pregnant. Those officials forced her to accompany them to a "Birth Control Service Station" where labor was induced and the fetus was aborted. After the abortion, Lin-Zheng decided to leave China even though his wife's health had deteriorated after the abortion, and even though they wanted to have more children. In a letter she submitted in support of Lin-Zheng's asylum petition, Lin-Zheng's wife claimed that the family intends to reunite and have more children (presumably in the United States) if Lin-Zheng is granted relief.

## B. The Asylum Hearing.

During his asylum hearing, Lin-Zheng testified about incidents that he had not included in his asylum petition. For example, on cross-examination, he testified that a second IUD

7

had been forcibly inserted into his wife in 2004, after the forced abortion alleged in his petition. Lin-Zheng also testified during cross-examination that he had been living at home until his departure from China, but was frequently away in November and December of 2004. His testimony was somewhat contradictory, and it is not clear whether he was claiming to be away from home because of his work or because he was in hiding. In any event, he testified that his wife informed him that birth control cadres were looking for him while he was away. They purportedly threatened to arrest him and demanded that he appear at their offices and promise not to have any more "unauthorized children." They also purportedly threatened to forcibly sterilize him.

The IJ denied relief after concluding that Lin-Zheng's testimony was "implausible and overall unpersuasive." The IJ was particularly troubled by the fact that Lin-Zheng testified extensively about the family planning cadres' harassment and

8

threats after the second abortion, but those incidents were not mentioned in his asylum petition, or in the letter that his wife submitted in support of it. The IJ viewed that as a "serious omission . . . central to [Lin-Zheng's] claim." The IJ reasoned that, "[h]ad this event occurred it is extremely unrealistic that [Lin-Zheng] would not have included such information in his application and his wife would not have included such information in her letter."

The IJ was also troubled by the fact that Lin-Zheng's asylum application mentioned nothing about a second IUD being inserted in 2004 after his wife underwent a forced abortion, although he testified about that incident at the hearing. The omission was all the more suspect because Lin-Zheng's wife also failed to mention it in her letter. The IJ reasoned:

> The omission cannot be taken lightly in light of the fact that she made reference to an IUD insertion in 1991. It is inconceivable that she would mention an IUD insertion in 1991 and fail to mention the most recent insertion of an IUD in 2004.

9

The IJ also characterized Lin-Zheng's testimony on cross-examination as "somewhat delirious" and "incoherent." Lin-Zheng "was not able to provide the specifics requested by the Court and counsel for the government[,]" and the IJ concluded that Lin-Zheng was "making up new stories" as he went along. The IJ explained: "once [Lin-Zheng] was taken outside the script [his] testimony was clearly disjointed and [he] could not explain matters and rather than explaining he kept adding, . . .unfortunately to his detriment."

The IJ was also troubled by Lin-Zheng's testimony about the population control measures in his region because it was inconsistent with background materials that said there was no evidence of forced abortions in the region of China where he and his wife lived.

## C. The BIA's Decision.

On appeal, the BIA was also troubled by discrepancies between Lin-Zheng's testimony before the IJ and assertions in

his asylum petition. The BIA noted that Lin-Zheng's petition made no mention of visits by birth control cadres in the months following the abortion, or threats of arrest and forced sterilization. In the BIA's view:

> the omission itself is so substantial that if it were credible, it could form the basis of an asylum application. *See* 8 U.S.C. 1101(a)(42) (providing the definition of a refugee which includes persons who have a well-founded fear that they will be forced to undergo sterilization). In other words, the omission is directly related to threats and pursuits of persecution made against [Lin-Zheng]. Hence, we cannot characterize the omission as minor or, in this instance, excusable. The respondent also changed his testimony as to where he was residing in the last months of 2004, at first saying he lived at his own household [], but then saying he was sometimes hiding elsewhere, after he had testified to his own sterilization threat []. Consequently, we do not find that the Immigration Judge's adverse credibility finding is clearly erroneous and we agree that the respondent did not meet his burden of proof for asylum.

This petition for review followed.

## II. Legal Background.

11

The Immigration and Nationality Act ("INA" or "Act") gives the Attorney General discretionary authority to grant asylum to an alien who qualifies as a "refugee." Originally, the Act defined "refugee" as:

> (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . .

8 U.S.C. § 1101(a)(42).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Section 601(a) of IIRIRA added the following language at the end of 8 U.S.C. § 1101(a)(42):

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal

to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well-founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42).[3]

Congress enacted § 601(a) for the express purpose of overturning the BIA's decision in *Matter of Chang*, 20 I. & N. Dec. 38 (B.I.A 1989). *See* H.R. Rep. No. 104-469 (I), at 173 (1996) ("The primary intent of [this section] is to overturn several decisions of the [BIA], principally *Matter of Chang* and *Matter of G-*."). In *Matter of Chang*, the petitioner had requested asylum based upon his fear that he would be forcibly sterilized if returned to China. In affirming the IJ's rejection of his claim, the BIA explained:

We cannot find that implementation of the "one

---

[3] Unless otherwise indicated, we will refer to this amendment as "§ 601(a)."

13

couple, one child" policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." . . . To the extent . . . that such a policy is solely tied to controlling population, rather than as a guise for acting against people for reasons protected by the Act, we cannot find that persons who do not wish to have the policy applied to them are victims of persecution or have a well-founded fear of persecution within the present scope of the Act.

20 I. & N. Dec. at 44.

The BIA had an opportunity to apply the newly expanded definition of "refugee" in *Matter of C-Y-Z-*, 21 I. & N. Dec. 915 (BIA 1997) (*en banc*). There, an alien, whose wife and three children had remained in China, petitioned for asylum arguing that "he was persecuted in China on account of his opposition to China's birth control policies." *Id*. at 916. According to the petitioner, the persecution consisted of his wife being sterilized against her will after the birth of their third child. The IJ rejected the claim explaining: "'(i)n effect, the applicant seeks to ride on his wife's coattails or claim asylum because of alleged

14

adverse factors to his wife, including forced sterilization. He, himself, has never been persecuted and he cannot show either past persecution or a reasonable fear of future persecution.'" *Id.* at 916 (quoting the IJ's decision) (alteration in *C-Y-Z-*).

On appeal, the BIA acknowledged that the IJ's decision was consistent with *Matter of Chang.* However, the Board noted that "subsequent to the Immigration Judge's decision, the law was amended to specifically address coercive family planning practices in the context of applications for asylum, and *Matter of Chang*, has been superseded . . . ." The Immigration and Naturalization Service ("INS")[4] actually agreed with the petitioner before the BIA and took the position that "past

_____

[4] On March 1, 2003, the functions of the INS were transferred from the Department of Justice to three different agencies (Immigration and Customs Enforcement, Customs and Border Protection, and Citizenship and Immigration Services) in the newly formed Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The immigration courts and the BIA remain within the Department of Justice under the direction of the Attorney General.

15

persecution of one spouse can be established by coerced abortion or sterilization of the other spouse."[5]  *Id*. at 917. Accordingly, the Board held that "the applicant in this case has established eligibility for asylum by virtue of his wife's forced sterilization." *Id*. at 918.[6]  Given the lack of opposition to the merits of the claim, the Board was able to reach that conclusion without any explanation, examination of statutory text, or inquiry into congressional intent.  *See id*. at 919 ("In view of the enactment of section 601(a) of the IIRIRA and the agreement of the parties that forced sterilization of one spouse on account of a ground protected under the Act is an act of persecution against the other spouse, the applicant has established past persecution.").

---

[5] The INS did oppose the *C-Y-Z-* petitioner's asylum application based on credibility and evidentiary concerns.

[6] The Board rejected the INS' "assertion that an alien who has established past persecution" based on coercive family planning procedures was subject to any additional burden, such as proving that the procedure amounted to an "atrocious form" of persecution.  *Id*. at 919.

16

Thereafter, the Courts of Appeals that were called upon to interpret § 601(a) initially accepted the holding in *C-Y-Z-*. However, until recently the "*C-Y-Z-* rule" was not contested by the government. *See, e.g., Lin-Jian v. Gonzales*, 489 F.3d 182, 188 (4th Cir. 2007) ("The BIA interprets this provision to cover the spouse of a person subjected to a forced abortion or sterilization, [], and the government does not challenge this interpretation.") (citing *C-Y-Z-*); *Cao v.Gonzales*, 442 F.3d 657, 660 (8th Cir. 2006) ("In a case where forced sterilization and/or abortion is the basis of a male petitioner's claim, we allow him to stand in the shoes of his wife in claiming persecution.") (citing *C-Y-Z-*); *Zhang v. Gonzales*, 434 F.3d 993, 1001 (7th Cir. 2006) (accepting the *C-Y-Z-* holding without discussion and rejecting the government's position that subsequent break-up of the marriage nullifies spouse's status based on wife's persecution); *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003) (accepting the *C-Y-Z-* rule without discussion and then reversing

17

adverse credibility finding); *see also Zhang v. I.N.S.*, 386 F.3d

66, 73 (2d Cir. 2004) ("However difficult the problems of

identifying legitimate spousal persecution claims, we are obliged

to defer to the BIA's interpretation of § 1101(a)(42)."),

*overruled by Lin*, 494 F.3d 296.[7]

    In 2006, in a case remanded from the Court of Appeals

for the Second Circuit, the BIA reaffirmed the rule of *C-Y-Z-*.[8]

*Matter of S-L-L-*, 24 I. & N. Dec. 1 (BIA 2006). By then,

---

[7] As noted at the outset, we initially accepted the Board's interpretation of IIRIRA § 601(a) also. *See Sun Wen Chen*, 491 F.3d at 103; *Cai Luan Chen v. Ashcroft*, 381 F.3d 221, 227 (3d Cir. 2004) ("[I]f *C-Y-Z-*'s interpretation is permissible (and we assume for the sake of argument that it is), the distinction that the BIA has drawn between married and unmarried couples satisfies step two of *Chevron*.").

[8] The matter was remanded to the BIA with a request that the BIA explain its rationale for the *C-Y-Z-* rule. *Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 192 (2d Cir. 2005) ("[B]ecause the BIA has never adequately explained its rationale for establishing *spousal* eligibility under IIRIRA § 601(a), we cannot reasonably determine the status of boyfriend and fiancé eligibility under IIRIRA § 601(a).") (emphasis in original).

however, the Department of Homeland Security ("DHS") had reversed the prior position of the INS and "request[ed] that [the Board] replace the spousal eligibility rule adopted in *Matter of C-Y-Z-* . . . with a case-by-case approach grounded in the 'other resistance' clause of section 101(a)(42) of the Act." *Id*. at 3. In response, the Board opined that "[t]here is no clear or obvious answer to the scope of protections afforded by the [IIRIRA] amendment to partners of persons forced to submit to an abortion or sterilization." *Id*. at 4. The Board then applied what it described as: "general principles requiring nexus and level of harm[,]" and concluded that "[w]hen the government intervenes in the private affairs of a married couple to force an abortion or sterilization, it persecutes the married couple as an entity." *Id*. at 5-6. However, the Board ultimately relied upon nothing more than its own view of the impact of coercive family planning measures on the marital relationship and affirmed the rule of *C-Y-Z-*. Accordingly, the Board held that the broadened definition

19

of "refugee" set forth in § 601(a) "protect[s] both spouses." *Id.*
at 6.

Soon thereafter, we decided *Sun Wen Chen*. A divided
panel of this court held that the Board's "spousal eligibility" rule
(as articulated in *C-Y-Z-* and *S-L-L-*) was entitled to *Chevron*
deference because the majority perceived an ambiguity in §
601(a).[9] 491 F 3d. at 107 ("[N]othing in the statute evince[s]

_____

[9] *See Chevron U.S.A., Inc. v. Natural Resources Defense
Council, Inc.,* 467 U.S. 837 (1984). Under our familiar
*Chevron* analysis:

> [I]n reviewing an agency's construction of a
> statute administered by the agency, the court
> asks first if the statute is silent or ambiguous
> with respect to the specific issue of law in the
> case, using traditional tools of statutory
> construction to determine whether Congress had
> an intention on the precise question at issue. If
> Congress's intention is not evident, the court
> moves to the second step, where the question
> for the court is whether the agency's answer is
> based on a permissible construction of the
> statute. When Congress has left a gap in a
> statute, implicitly leaving the administering
> agency responsible for filling that gap, a court
> may not substitute its own construction of a
> statutory provision for a reasonable

Congressional intent to establish a particular policy regarding spousal eligibility."). The majority then concluded that the Board's interpretation was a permissible construction of the statute and thus entitled to deference. In the majority's view, it was not unreasonable for the Board to conclude that "the scope of the harm resulting from the enforcement of a population-control policy by forced abortion and involuntary sterilization extends to both spouses." *Id*. at 108.

The dissent argued that the majority had erred in applying *Chevron*, because § 601(a) is not ambiguous. In the dissent's view, congressional intent could readily be determined from the text of the statute, and therefore there was no need to defer to the agency's construction of the statute. Rather, in the dissent's

---

interpretation made by the administrator of an agency.

*Augustin v. Attorney General*, 520 F.3d 264 (3d Cir. 2008) (citations and internal quotation marks omitted). *Chevron* is discussed more thoroughly in Section III, below.

view, § 601(a) "unambiguously broaden[ed] the definition of 'refugee' to include '*a person* who has been forced to abort a pregnancy or to undergo involuntary sterilization[.]" The dissent argued that "the omission of any reference to a 'spouse' [was not] accidental or insignificant." *Id.* at 114 (McKee, J. dissenting) (emphasis in original). Thus, the dissent concluded that analysis should begin and end with the text of the statute because there was no textual "gap" for an agency interpretation to fill. *Id.* Moreover, even assuming the statute contained some latent ambiguity, the dissent believed that the Board's interpretation of § 601(a) would still not be entitled to deference because it was not a reasonable interpretation of the statute. *Id.* at 114-19.

Not long after the panel decided *Chen,* the *en banc* Court of Appeals for the Second Circuit reviewed the Board's decision in *S-L-L-* as well as that court's own precedent. In *Shi Liang Lin v. United States Department of Justice*, 494 F.3d 296 (2d Cir.

2007) (*en banc*), the *en banc* court rejected the Board's interpretation of § 601(a), agreeing instead with the dissent in *Chen.* In denying Shi Liang's petition for review, the Court of Appeals for the Second Circuit held that § 601(a) clearly and unambiguously states congressional intent to limit refugee status to one who is actually subjected to the coercive family planning procedure. *Id.* at 304.[10] The court noted that the amendment repeatedly refers to "a person" who has been victimized, and concluded that, "[u]nder the language used by Congress, having someone else, such as one's spouse, undergo a forced procedure does not suffice to qualify an individual for refugee status." *Id.* at 305-06. The court thus held that "the statutory scheme unambiguously dictates that applicants can become candidates for asylum relief only based on persecution that they themselves

_____

[10] As we shall explain, an alien who is not actually subjected to coercive family planning policies can still establish refugee status if he was actually persecuted for opposing those policies or has a well-founded fear of being subjected to such persecution.

23

have suffered or must suffer." *Id.* at 308.

The Attorney General has recently released a new opinion overruling the Board's *C-Y-Z-/S-L-L-* interpretation. *See Matter of J-S-*, 24 I. & N. Dec. 520 (A.G. 2008). Although we note this development for the sake of thoroughness, it is not relevant to our analysis. As explained below, given the unambiguous text of § 601(a), our inquiry into congressional intent must begin and end with the statutory text.

It is against this background that we granted *en banc* consideration of Lin-Zheng's petition for review.

### III. Our Standard of Review.

The Board's view of spousal asylum under § 601(a) is a legal conclusion which we review *de novo*. *See, e.g., Yusupov v. Attorney General*, 518 F.3d 185, 197 (3d Cir. 2008). Since we are called upon to interpret a statute that is within the scope of an agency's rulemaking and lawmaking authority, our inquiry implicates the principles set forth in *Chevron U.S.A., Inc. v.*

24

*Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

*See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999) ("principles of *Chevron* deference" apply to the INA).

As noted earlier, under *Chevron*, we must first determine "if the statute is silent or ambiguous with respect to the specific issue of law in the case, using traditional tools of statutory construction to determine whether Congress had an intention on the precise question at issue." *Augustin*, 520 F.3d at 268 (internal quotation marks omitted). If congressional intent is clear, "the inquiry ends, as both the agency and the court must give effect to the plain language of the statute." *Yusupov*, 518 F.3d at 197. Where, however, a "statute is silent or ambiguous with respect to the specific issue, the court proceeds to step two, where it inquires whether the agency's answer is based on a permissible construction of the statute." *Id*. at 198 (internal quotation marks omitted).

We review factual findings of the Board under the

"substantial evidence" standard. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Guo v. Ashcroft*, 386 F.3d 556, 561 (3d Cir. 2004). A factual determination will be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481 (citation omitted). "Adverse credibility determinations are factual matters and are also reviewed under the substantial evidence standard." *Guo*, 386 F.3d at 561. The Board's adverse credibility determination must be upheld on review unless "'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

### IV. The Meaning of IIRIRA § 601(a).

As noted earlier, in enacting IIRIRA § 601(a), Congress broadened the definition of "refugee" to include "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive

26

population control program," as well as "a person who has a well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance." 8 U.S.C. § 1101(a)(42). We must determine if Congress intended to include spouses such as Lin-Zheng within this broadened definition of "refugee."

A basic tenet of statutory construction is that we "must begin with . . . the assumption that the ordinary meaning of [statutory] language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985); *see also Flora v. United States*, 357 U.S. 63, 65 (1958) ("In matters of statutory construction, the duty of this Court is to give effect to the intent of Congress, and in doing so our first reference is of course to the literal meaning of the words employed.") In ordinary usage, "person" is defined as "an individual human being." *Webster's Third New Int'l Dictionary* (1986); *see also* Black's Law Dictionary (8th ed.

2004) (defining "person" as "a human being"). "Undergo" means "to submit to" or "to go through." *Webster's, supra*. Thus, there is no room for us to conclude that Congress intended to extend refugee status to anyone other than *the individual who* has either been forced to submit to an involuntary abortion or sterilization, has been persecuted for failure or refusal to undergo such a procedure, or has a well-founded fear of that occurring in the future.[11] Had Congress wished to extend protection to that person's spouse, it could easily have defined "refugee" to include the person persecuted as well as his or her spouse. *See Sun Wen Chen*, 491 F.3d at 113. (McKee, J., dissenting). ("Congress could have easily drafted this provision

---

[11] In *Cai Luan Chen*, we noted in *dicta* that a contrary interpretation "is not without difficulties." 381 F.3d at 225. There, we discussed the spousal eligibility rule of *C-Y-Z-*, and possible justifications for it. However, we did not need to interpret § 601(a). Rather, we simply noted that the Board's justification for the rule could be "the assumption that the persecution of one spouse by means of a forced abortion or sterilization causes the other spouse to experience intense sympathetic suffering that rises to the level of persecution." *Id.*

28

to extend to 'married couples who have been subjected to a forced abortion or involuntary sterilization.'"). However, Congress did not include anyone other than the "person" who is actually subjected to coercive family planning policies, and neither this court, nor the BIA, can amend the statute by broadening the meaning of "refugee" beyond the parameters of the statutory text. *See id.* at 107 (majority opinion) ("[A] statute's silence on a given issue does not confer gap-filling power on an agency unless the question is in fact a gap - an ambiguity tied up with the provisions of the statute."). Yet, since 1997, the *C-Y-Z-* spousal eligibility rule has resulted in refugee status being conferred on persons who were never faced with forced sterilization or abortion, and could not claim a well-founded fear of being forcibly subjected to those procedures in the future.

As the court concluded in *Lin,* the statute "could not be more clear in its reference to 'a person,' rather than 'a couple'"

and "cannot be read reasonably to cover an individual's fears arising from a coercive procedure performed on someone else." 494 F.3d at 305-06; *see also id.* at 308 ("[W]e conclude that the statutory scheme unambiguously dictates that applicants can become candidates for asylum relief only based on persecution that they themselves have suffered or must suffer."); *Sun Wen Chen*, 419 F.3d at 113 (McKee, J., dissenting) ("[o]ne need look only to the words Congress used in the statute to conclude that § 1101(a)(42) . . . applies to 'a person who' [meets the criteria outlined in the provision]"). Moreover, as also noted in *Lin,* the use of the pronouns "'he' and 'she' reinforces the intention of Congress to limit the application of the clause to individuals who are themselves physically forced to undergo an abortion or sterilization." 494 F.3d at 306.

When the BIA established the spousal eligibility rule of *C-Y-Z-*, the agency noted that § 601(a) does not mention spouses. However, the BIA concluded that the omission was

not dispositive. *See  S-L-L-*, 24 I. & N. Dec at 5.  The Board

reasoned:

> The lack of such a reference, . . . does not
> necessarily preclude an applicant from
> demonstrating past persecution based on harm
> inflicted on a spouse when both spouses are
> harmed by government acts motivated by a
> couple's shared protected characteristic. For
> example, *putting aside the amendment* for a
> moment, if a government, as part of a campaign
> of persecution against members of a particular
> religious group, subjected married couples within
> that religious group to a policy of mandatory
> sterilization, the government's sterilization of
> either party to the marriage harms both
> individuals and is on account of the religion of
> both.

*Id.* (Emphasis added)  Thus, while interpreting § 601(a), the

BIA "put aside" the very statutory text that should have

controlled its inquiry into congressional intent.

We conclude that § 601(a) is clear and unambiguous.  We

must therefore "give effect to the plain language of the statute."

*Yusupov*, 518 F.3d at 197.  Accordingly, we now overrule the

holding in *Sun Wen Chen*, and instead adopt the analysis of the

Court of Appeals for the Second Circuit in *Lin*.

Before concluding our discussion, we think it important to emphasize that spouses of individuals subjected to coercive family planning obviously remain eligible for derivative asylum under 8 U.S.C. § 1158(b)(3)(A). That provision of the Act generally confers eligibility for asylum on "[a] spouse or child of an alien who is granted asylum under this subsection" where the spouse or child is " accompanying, or following to join, [the alien with the primary asylum claim]." 8 U.S.C. § 1158(b)(3)(A).

Spouses also remain eligible for relief in their own right under the specific language of § 1101(a)(42), provided they qualify as a refugee based upon their own "persecution." For example, the "other resistance" clause of § 1101(a)(42) confers refugee status on "[a] person . . . who has been persecuted . . . for other resistance to a coercive population control program . . . [or] has a well-founded fear that he or she will be . . . subject

to persecution for such . . . resistance." Thus, an applicant can claim refugee status if he/she can demonstrate actual persecution for resisting a country's coercive family planning policy, or a well-founded fear of future persecution for doing so.

## V. Conclusion

For the reasons set forth above, we will deny Lin-Zheng's petition for review to the extent it is based on allegations of his wife's forced abortion and/or the forced insertion of an IUD. That testimony fails as a matter of law because, even if credible, it does not establish eligibility for asylum under § 1101(a)(42), as amended by § 601(a) of IIRIRA.

We realize that Lin-Zheng also testified about his own harassment by family planning authorities. That testimony could, under some circumstances, form the basis of an independent asylum claim. Here, however, there is substantial evidence on the record to support the Board's adverse credibility determination with regard to this portion of Lin-Zheng's

testimony. *Cao v. Attorney General*, 407 F.3d 146, 152 (3d Cir. 2005). Accordingly, we find it unnecessary to remand this matter for any further proceedings to consider that basis for relief.