OPINION OF THE COURT
PER CURIAM.
Petitioner Sergey Viadimirovich Garder, a native and citizen of Russia, petitions for review of the Board of Immigration Appeals’s (“BIA”) decision affirming a decision of the Immigration Judge (“IJ”) denying his applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (“CAT”). For the following reasons, we will grant Garder’s petition for review.
I.
Garder entered the United States on a non-immigrant visa in 2002. He filed an application for asylum, withholding of removal, and CAT relief, asserting that he had been persecuted because of his Baptist faith. His application stated that he and members of his religious community were repeatedly attacked by Cossacks and Russian neo-Nazis for proselytizing.
At his removal proceedings, Garder testified that he was attacked at least nine times from 1996 through 2002 due to his religion by Cossacks and the Russian National Unity (“RNU”). He did not claim to know much about the groups and their relationship with the government but described the Cossacks as a “free organization” that consider themselves a “volunteer guard.” (A.R.91.) He also stated that they behaved like the police and “guarded order.” (A.R.100.) He described the RNU as nationalists. (A.R.96.)
Garder testified that he was injured during many of the attacks and that he sought medical attention after three of the Cossack attacks and one of the RNU attacks. He stated that after a 1996 incident in a park in which he suffered a wrist injury, bruises, and bloody knees, he was turned away from a medical center because they did not have gauze or bandages. In March 1999, Garder attended a youth meeting at the home of a religious community member, Brother Georgy. Cossacks entered the house, accused the Baptists of *782 brainwashing young people, dragged them to the street and whipped them. Garder’s leg was injured, and he and others were taken by ambulance to the hospital, where he was treated on an outpatient basis for several days. In December 2001, Garder was stabbed by someone to whom he was proselytizing and was given a bandage at a trauma center. Finally, in February 2002, he stated that he was treated by a chiropractor — who was a member of his religious community — after he was slammed to the ground by the RNU and suffered three dislocated vertebrae. Garder did not, however, submit any medical documentation in his removal proceedings. Nor did Garder seek medical attention after any of the other attacks, including those in which he: (1) was struck in the cheek with a whip (1998), (2) fainted after a Cossack hit him in the head (2000), and (3) was beaten with whips and sticks (2001). He explained that he did not seek medical help because there were no treatment centers nearby, it was easier to go home, or because other people helped him.
Garder also largely avoided reporting the attacks to the police. He stated that after the 1996 attack, he told the police who were patrolling the park what had happened, but that they just told him to go home. (A.R.94.) Brother Georgy’s parents reported to the police the incident which sent Garder to the hospital, but Garder does not believe that the police followed up on the complaint. (A.R.100-01.) Additionally, when a Baptist priest was attacked by Cossacks, several people (including Garder) signed a police report. (A.R.10S-04.) Garder stated that there was “no result” to this police complaint, either. (A.R.104.) He testified that he did not report the other incidents to the police for various reasons, including the time of day that the attack occurred, the particular town where the attacks occurred, and the unavailability of a telephone. Additionally, he stated the police would not help because they treated Baptists poorly, and because he often could not identify his attackers. He did not submit any of the police reports as evidence — explaining that he did not obtain them because he did not think he would need them.
In the summer of 2001, after he had already been attacked several times, Garder traveled to the United States and worked in Ocean City, Maryland. He did not apply for asylum at that time because he was unaware that he could do so and because he hoped the situation in Russia would improve. So, he returned to Russia at the end of the summer.
After he returned to Russia, he was attacked at least two more times and left his university. He testified that his family finally convinced him that he needed to leave Russia, and that he thus came back to the United States in 2002. Although Garder settled in southern New Jersey, he joined the Maryland church that he had attended the previous summer. Garder submitted a letter from the church’s preacher stating that he had been a member since fall 2003 (although the letter was dated March 2003). Garder testified that he attends church as often as possible but that he does not participate in evangelical activities in the United States.
Igor Kotler testified as an expert regarding the Cossacks and RNU and the treatment of Baptists in Russia. He stated that the Cossacks are an “ethnographic group of the Russian people” who are “very nationalistic, very, very pro-government, and pro-church people.” (A.R.168, 170.) When asked if there was any connection between the Cossacks and the Russian government, Kotler stated that the Cossacks are “considered to be close allies of the government,” and that there are several areas — including the Stavapol region where Garder is from — where “they are allowed to patrol areas even without *783 police to maintain order and they are allowed ... to carry their weapon and they experience full support of the government.” (A.R.170.) When asked what “patrol” meant, he answered: “to maintain order ... stop and catching rebels.” (A.R. 171.)
On October 23, 2006, the IJ denied Garder all requested relief except for voluntary departure. He made an adverse credibility determination, and found that Garder did not meet the standard for asylum, withholding of removal, or CAT relief. The BIA affirmed the IJ’s denial of relief without opinion on June 5, 2008.
Through counsel, Garder now petitions for review of the BIA’s final order of removal.
II.
We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). Where, as here, the BIA affirms the IJ’s decision without opinion, we review the IJ’s decision directly as the final agency determination. Dia v. Ashcroft, 353 F.3d 228, 245 (3d Cir.2003). We review an IJ’s factual findings under the “substantial evidence” standard. Lin-Zheng v. Att’y Gen., 557 F.3d 147, 155 (3d Cir.2009). Under this standard, “a factual determination will be upheld if it is supported by ‘reasonable, substantial, and probative evidence on the record considered as a whole.’ ” Id. (internal citation omitted). Alternatively, “where the agency’s determination is based on an inaccurate perception of the record, omitting potentially significant facts, we may remand for reconsideration or rehearing, ... or, if circumstances warrant it, a new hearing.” Tian-Yong Chen v. INS, 359 F.3d 121, 127 (2d Cir.2004) (internal citations omitted). Our review of the agency’s legal conclusions is de novo, and we apply the principles of deference set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Lin-Zheng, 557 F.3d at 155.
The IJ determined that Garder did not suffer past persecution because he did not “show that he was previously persecuted at the hands of the government or persons the government is unwilling or unable to control.” This decision was based largely on the IJ’s finding that Garder and Kotler described the Cossacks and RNU as “free organization(s) having no connection to the government.” However, while Garder stated that he did not believe the Cossacks were affiliated with the government, he also asserted that they behaved like the police and “guarded order.” Additionally, Kotler testified that the Cossacks are “considered to be close allies of the government” and that there are several areas — including the Stavapol region where Garder is from — where “they are allowed to patrol [ ] even without police to maintain order and they are allowed ... to carry their weapon and they experience full support of the government.” (A.R.170.) The IJ thus mischaracterized the testimony by finding that Garder “failed to present any testimony., by his own testimony [or] his expert witness” that the government was “unable or unwilling to control the Cossacks or RNU nationalists who allegedly persecuted Respondents.”
The IJ also determined that Garden’s claim failed in part because, when asked to do so by the court, he did not provide specific information regarding his assertion that his family continued to be persecuted, and that affidavits submitted by his mother did not corroborate this claim. (A.R.35.) See Abdulai v. Ashcroft, 239 F.3d 542, 554 (3d Cir.2001) (An applicant is expected to “corroborate facts which are central to his claim and easily subject to verification.” (internal citations omitted)). This conclusion is incorrect in both re *784 spects. First, when reviewing the transcript we found neither testimony by Garder claiming that his family continues to be persecuted nor questioning by the IJ about attacks on his family. Second, one of Garder’s mother’s affidavits states that their family has “suffered from the Cossacks” several times since Garder left Russia. (A.R.193-94.) Thus, if Garder is claiming that his family is being persecuted in Russia, he has introduced evidence supporting that assertion, and if he never testified to such continued persecution, he need not supply corroboration.
There may be valid reasons for denying Garder’s application for relief. Nevertheless, the IJ’s mischaracterization of at least two salient issues undermine his decision and we are unable to adequately consider whether substantial evidence supports the denial Garder’s application for asylum, withholding of removal, and CAT relief.[1] See Tian-Yong Chen, 359 F.3d at 127-28 (remanding BIA opinion due to its “fundamental error” of ignoring a significant aspect of the petitioner’s testimony). Because it is unclear whether the IJ would have reached the same result had he not misconstrued the testimony and evidence, we will remand the case to the BIA with instructions for it to remand to the IJ to reevaluate the petitioner’s claim.
For the foregoing reasons, we conclude that the IJ did not adequately consider Garder’s application for asylum, withholding of removal, and CAT relief. Because of its errors, we cannot accept its determination that Garder failed to establish past persecution or a fear of future persecution. Accordingly, we will grant Garder’s petition for review, vacate the BIA’s decision, and remand the case for further proceedings.

. We note that the IJ found Garder to be not credible. The IJ stated, without giving any examples, that Garder's testimony was riddled with inconsistencies, and he appeared to base the credibility determination in large part on Garder's failure to provide medical records documenting his injuries. Thus, to the extent IJ failed to “follow the BIA's avowed policy of considering separately the issues of credibility and failure to provide corroboration,” the adverse credibility analysis is also unsound. See Chukwu v. Att’y Gen., 484 F.3d 185, 191 (3d Cir.2007).