NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3231
_____

EMPIRE KOSHER POULTRY, INC.,

Petitioner

v.

UNITED STATES DEPARTMENT OF AGRICULTURE;
UNITED STATES OF AMERICA,

Respondents
_____

On Petition for Review of an Order of the
United States Department of Agriculture
(P&S D.C. No. D-10-0109)
Judicial Officer:  Hon. William G. Jenson
_____

Submitted Under Third Circuit LAR 34.1(a)
March 29, 2012

Before:   FUENTES, SMITH, and JORDAN, *Circuit Judges*.

(Filed April 12, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Empire Kosher Poultry, Inc. ("Empire") petitions for review of the July 20, 2011 decision and order of the Secretary of the U.S. Department of Agriculture ("the Secretary") determining that Empire violated Section 410 of the Packers and Stockyards Act ("the Act"), 7 U.S.C. § 228b-1, by failing to make timely payments for the purchase of live poultry. The Secretary assessed an $18,000.00 fine for that violation. For the reasons that follow, we will deny the petition for review.

## I.    Background

Empire is a live poultry dealer that operates a kosher chicken and turkey processing plant in Pennsylvania. Koch's Turkey Farm ("Koch") also operates a turkey processing facility. Between April and June 2008, Empire entered into an agreement to provide Trader Joe's Company, Inc. ("Trader Joes") with 43,200 antibiotic-free ("ABF") turkeys beginning the week of November 3, 2008. In order to acquire the turkeys necessary to fulfill that obligation, Empire contacted Duane Koch ("Mr. Koch"), an owner and the vice president and general manager of Koch, who agreed to sell Empire live ABF turkeys for $.70 per pound. At the time, Empire and Koch did not reach an agreement concerning the terms of payment.[1]

---

[1] The Secretary found that the parties "did not have an express agreement concerning credit terms prior to Empire's purchase of turkeys in any of the transactions at issue in the instant proceeding." (App. at 11A.) Although the parties dispute that finding in their briefs, we must defer to the Secretary's finding of fact, to the extent that it is supported by "substantial evidence" in the record. *See* 5 U.S.C. § 706(2)(E). Here, as discussed *infra*, there is evidence in the record which supports the Secretary's finding concerning the parties' agreement. Thus, we assume for the purpose of our recitation of

Koch made several turkey deliveries to Empire between August and September 2008 that are relevant to this appeal.[2] It delivered four truckloads on August 13 and 14. The first truckload and eighty-four turkeys from the second truckload were unloaded and processed on August 14. However, Empire rejected the remaining turkeys because they failed to pass USDA and rabbinical inspections. Thereafter, Koch delivered four truckloads of live turkeys on August 20, five truckloads on September 3 and 4, four truckloads on September 5, and four truckloads on September 8.

Shortly after each delivery, Mr. Koch sent Empire an invoice, requesting payment within fourteen days.[3] Mr. Koch said that the fourteen-day payment period was important because Koch needed to compensate its suppliers within fourteen days. However, Empire disagreed with Mr. Koch's proposed payment period, ultimately failing to pay Koch within fourteen days of each of the disputed deliveries. When Mr. Koch called Jeffrey Brown, Empire's chief operating officer, to inquire about the delinquent payments, the discussion turned to the dispute about the quality of the birds that had failed inspections and Brown told him to send more turkeys if he wanted to get paid. On September 24, 2008, Koch contacted the USDA's Grain Inspection, Packers &

the facts, that the parties did not reach "an express agreement concerning credit terms." (App. at 11A.)

[2] Koch also delivered live ABF turkeys to Empire on August 6, 2008. However, the complaint filed against Empire does not allege that Empire violated the Act by failing to pay for the August 6 delivery in a timely manner.

[3] On August 25, 2008, Koch sent Empire an invoice for the August 13, 14, and 20 deliveries. It sent invoices for the September 3, 4, and 5 deliveries on September 10, and for the September 8, 2008 delivery on September 17, 2008.

Stockyards Administration ("GIPSA") seeking assistance in its efforts by Koch to secure payment from Empire. As a result, GIPSA began an investigation. Empire did not pay Koch in full until November 3, 2008.

On February 4, 2010, a deputy administrator from the Department of Agriculture filed a complaint against Empire alleging that Empire willfully violated the Act by delaying payment for the live ABF turkeys it purchased from Koch. On March 8, 2011, an Administrative Law Judge ("ALJ") issued a decision and order concluding that Empire violated Section 410 of that act, codified at 7 U.S.C. § 228b-1(a),[4] because it had failed to pay for the turkeys within the time period required by the statute. The ALJ ordered Empire to "cease and desist from failing to pay for poultry purchases within the time period required by Section 410 of the Act," and assessed an $18,000.00 civil penalty against Empire for the tardy payments. (App. 53A.) Empire appealed that decision and order to the Department of Agriculture's Judicial Officer (the "JO"),[5] who adopted the ALJ's decision and order.

---

[4] Section 228b-1(a) provides, in relevant part:

> [e]ach live poultry dealer obtaining live poultry by purchase in a cash sale shall, before the close of the next business day following the purchase of poultry … deliver, to the cash seller … from whom such live poultry dealer obtains the poultry, the full amount due to such cash seller … on account of such poultry.

7 U.S.C. § 228b-1(a).

[5] Pursuant to 7 C.F.R. § 2.35(a)(1), the Secretary has delegated authority to the JO to serve as an officer with final decisionmaking authority in U.S. Department of Agriculture adjudicatory proceedings subject to 5 U.S.C. §§ 556 and 557.

In so doing, the JO found that Empire and Koch "did not have an express agreement concerning credit terms prior to Empire's purchase of turkeys in any of the transactions" in dispute. (App. at 11A.) The JO also determined that, because Koch "did not expressly extend credit to Empire prior to the transactions," the transactions "constituted live poultry … cash sales … requiring Empire to pay within the time required by 7 U.S.C. § 228b-1(a)." (App. at 16A.) The JO further concluded that "Empire's failure to pay for live poultry purchased, received, and accepted within the time period required for payment in a cash sale … constitute[d] an unfair practice, in willful violation of the [Act]." (App. at 16A.) The JO's decision automatically became the decision of the Secretary. *See supra* note 3.

Empire then filed this timely petition for review.

## II. Jurisdiction and Standard of Review

The Secretary had jurisdiction over this enforcement action pursuant to 7 U.S.C. § 228b-2(a),[6] and we have jurisdiction over Empire's petition for review pursuant to 28 U.S.C. § 2342(2) and 7 U.S.C. § 228b-3(h). Pursuant to the Administrative Procedures Act, we review the Secretary's decisions under a deferential standard, determining whether the Secretary's findings of fact are supported by substantial evidence. 5 U.S.C.

---

[6] The Secretary has the authority to enforce the provisions of the Act, which includes, among other things, the authority to (1) "cause a complaint in writing to be served upon … live poultry dealer[s]," (2) promulgate regulations governing hearings related to its enforcement authority, and (3) issue appropriate penalties for violations of § 228b-1 such as cease and desist orders and civil penalties. *See* 7 U.S.C. § 228b-2(a), (b). Thus, Congress "expect[s] the [Secretary] to be able to speak with the force of law" in his or her enforcement actions. *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

5

§ 706(2)(E). We review the Secretary's conclusions of law *de novo*, *Nat'l Indus. Sand Assoc. v. Marshall*, 601 F.2d 689, 699 n.34 (3d Cir. 1979), and accord the Secretary's reasonable interpretations of ambiguous provisions in the Act appropriate deference, *see Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (requiring deference to reasonable agency interpretations of the statutes they administer). Finally, we review the Secretary's choice of sanction for abuse of discretion, *Baiardi Food Chain v. United States*, 482 F.3d 238, 240 (3d Cir 2007), overturning the prescribed sanction only when it is "unwarranted in law or … without justification in fact." *Butz v. Glover Livestock Comm'n Co., Inc.*, 411 U.S. 182, 185-86 (1973) (internal quotation marks and citation omitted).

## III. Discussion

### A. *The Packers and Stockyards Act*

"The primary purpose of [the Act] is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry." H.R. Rep. No. 85-1048, at 1 (1957), *reprinted in* 1958 U.S.C.C.A.N. 5212, 5213. The statute was amended in 1987 to deal with, among other things, "the length of time some poultry producers are forced to wait for payment for their product or services," because, during those delays "producers must continue to pay their own operating and other expenses." H.R. Rep. No. 100-397, at 7 (1987), *reprinted in* 1987 U.S.C.C.A.N. 855, 857 (the Poultry Producers Financial Protection Act of 1987).

Section 410 of the Act governs the sale of live poultry by "live poultry dealer[s]."[7] As noted earlier, *supra* n. 4, it provides that a live poultry dealer purchasing poultry in a cash sale must pay the full amount due the next business day after purchase is made. 7 U.S.C. § 228b-1(a). The Act defines "cash sale" as "a sale in which the seller does not expressly extend credit to the buyer," though the Act does not go on to specify what "expressly" means. 7 U.S.C. § 228b-1(c). The parties agree that these conditions hold, unless the seller "expressly extend[s] credit" to the live poultry dealer. 7 U.S.C. § 228b-1(a), (c).

B.      *Whether Empire Violated § 228b-1 by Failing to Pay Koch for the Disputed Turkey Deliveries in a Timely Manner*

To determine whether substantial evidence supports the Secretary's decision, we must first decide whether the disputed transactions were "cash sales" under Section 410 of the Act, which necessarily turns on our understanding of what constitutes an "express" extension of credit. The Secretary urges us to adopt the plain and ordinary meaning of the term, which, according to Black's Law Dictionary, is "[c]learly and unmistakably communicated" or "directly stated" – a definition the Secretary, through the JO, adopted at the agency level. (App. at 18A (quoting Black's Law Dictionary 661 (9th ed. 2009)).) On the other hand, Empire defines the term "expressly extend credit" by reference to certain sections of the Uniform Commercial Code ("U.C.C."), which, it argues, provides a basis for us to determine that Koch "expressly extend[ed] credit" by its actions as well

---

[7] Empire stipulates that it is a live poultry dealer under the Act, and we agree. *See* 7 U.S.C. § 182(10) (defining a "live poultry dealer" as a "person engaged in the business of obtaining live poultry by purchase … for the purpose of … slaughtering it").

7

as the parties' "course of performance, course of dealing, and usage of trade."[8]

(Petitioner's Opening Br. 17, 29 (citations omitted).)

In deciding whether to adopt the Secretary's interpretation of the Act, we apply the principles set forth in *Chevron*. Under that standard, we "must first determine if the statute is silent or ambiguous with respect to the specific issue of law in the case, using traditional tools of statutory construction to determine whether Congress had an intention on the precise question at issue." *Lin-Zheng v. Att'y Gen.*, 557 F.3d 147, 155 (3d Cir. 2009) (*en banc*) (internal quotation and citation omitted). "If congressional intent is clear, the inquiry ends, as both the agency and the court must give effect to the plain language of the statute." *Id.* (internal citation and quotation omitted). Consistent with those principles, here, we need look no further than the plain text of the statute to determine Congress's intent. While the Act does not define the term "express," it has a plain and ordinary meaning: "directly, firmly, and explicitly stated." Merriam-Webster's

---

[8] Specifically, Empire relies upon Sections 2-204, 2-206, and 2-207 of the U.C.C. However, none of those sections explain what it means to "expressly" extend credit under the Act. Section 2-204 addresses the conditions under which parties may "show agreement" when forming a contract; it does not explain what it means for a party to "expressly" extend credit, as required by § 228b-1. U.C.C. § 2-204(1)-(3). Similarly, Section 2-206 does not define the terms "expressly extend credit," but instead prescribes conduct that, under the appropriate circumstances, may constitute acceptance of an offer for the sale of goods. *Id.* § 2-206. Section 2-207 explains that a party may accept an offer with a "definite and seasonable expression of acceptance or written confirmation … sent within a reasonable time … even though it states terms additional to or different from those offered or agreed upon," a proposition that, while perhaps true generally, does not advance Empire's position because Koch did not send Empire invoices for any of the disputed deliveries *before* the statutorily prescribed period for payment had lapsed, as required by the PSA. *Id.* § 2-207; *see infra* n.9.

Collegiate Dictionary 409 (10th ed. 2002). There is nothing the least ambiguous about the word. If a seller and buyer want to agree on credit terms, that must be done in a communication that is "direct[], firm[], and explicit[]," or, as the JO put it, "clear and unmistakable," (App. 18A.) Thus, we begin, and end, our inquiry under the first step of the *Chevron* analysis, concluding that, under Section 410 of the Act, a sale of live poultry is a cash sale unless a seller "directly, firmly, and explicitly state[s]" its intent to extend credit.

In light of that plain meaning of the word "express," we turn to the task of determining whether substantial evidence supports the Secretary's finding that Koch did not expressly extend credit to Empire, and that Empire failed to pay Koch before the expiration of the statutorily prescribed period for payment. As to the first issue, the record supports the Secretary's finding that Koch did not expressly extend credit to Empire. When Empire informed Koch that it would only agree to "reasonable" repayment terms, Koch did not state expressly (either verbally or in writing) that he intended to extend credit to Empire. In addition, Mr. Koch testified that, at the time the parties negotiated the disputed turkey sales, they never discussed credit terms. Moreover, when the parties eventually discussed payment terms, they could not reach an agreement concerning the payment period. Koch refused to agree to the thirty-day term of payment proposed by Empire, and Empire rejected the fourteen-day terms proposed by Koch in its invoices.[9] Thus, because substantial evidence supports the Secretary's determination that

_____

[9] Empire's argument that Koch's invoices, which contained a proposed 14-day payment period, serve as evidence that Koch expressly extended credit is unpersuasive.

Koch did not "expressly extend credit" to Empire before any of the disputed transactions, the parties' contract was a "cash sale" under Section 410.

As to the second issue, the evidence of record demonstrates, and it is not disputed, that Empire failed to pay Koch for any of the disputed deliveries before "the close of the next business day following [Empire's] purchase[s]." 7 U.S.C. § 228b-1(a). As noted earlier, Empire did not provide Koch with full payment for each of the disputed deliveries until November 3, 2008 – well beyond "the close of the next business day" after each delivery. Therefore, because the disputed deliveries from Koch to Empire were "cash sales," and because Empire failed to pay Koch in full for any of those deliveries before "the close of the next business day" after each delivery, we hold that the Secretary's conclusion that Empire violated § 410 is supported by substantial evidence.

---

Importantly, Koch sent those invoices after the statutorily required period for payment had already lapsed. Accepting the premise of Empire's argument – that a live poultry dealer is immune from liability under the Act when a seller extends credit after the statutorily prescribed period for repayment has lapsed – would require us to read the statute in a manner that would render its prompt payment requirement meaningless. That is, Empire's interpretation of the Act would allow a live poultry dealer to delay payment and then coerce a seller into extending credit as a condition of payment. Moreover, it conflicts with the purpose of the statute, which is to address "the length of time some poultry producers are forced to wait for payment for their product or services." H.R. 100-397, at 7 (1987), *reprinted in* 1987 U.S.C.C.A.N. 855, 857 (the Poultry Producers Financial Protection Act of 1987). Thus, Empire's argument that Koch's invoices demonstrate that it expressly extended credit is unavailing.

Furthermore, Empire's assertion that its purchase orders are evidence of Koch's intent to extend credit is baseless. There is no evidence in the record that Koch created those purchase orders, consented to their terms, or received them prior to when the statutorily prescribed period for repayment lapsed. Thus, they cannot prove that Koch "expressly extend[ed] credit" to Empire under the Act.

10

C.      *Whether the $18,000.00 Assessment Was Unreasonable*

Empire also contends that the Secretary abused his discretion by approving an $18,000.00 penalty against Empire for its late payments.  Specifically, it argues that "Empire's temporary withholding of payment from Koch[] was not a willful act," "[Koch] did not want the [Department of Agriculture] to … assess any penalty against Empire," that the Department of Agriculture "should be attempting to promote harmonious relationships between the … parties involved in agricultural transactions," and that "[t]here is no indication that Congress had any concern with protecting live poultry dealers" in enacting the Act.  (Petitioner's Opening Br. at 38-39.)  Agreeing as we do, that harmonious relationships are a good thing, and even accepting that Koch may not have wanted Empire to be fined, the fact remains that Empire consciously chose, in the context of a business dispute, to withhold payment.  It violated the Act.

Under the Act, if the Secretary finds that a "live poultry dealer has violated, or is violating … section [410] … . [he or she] may … assess a civil penalty of not more than $20,000 for each … violation … ."  7 U.S.C. § 228b-2(b).[10]  In determining the appropriate sanction, the Secretary must consider "[1] the gravity of the offense, [2] the size of the business involved, and [3] the effect of the penalty on the [live poultry dealer's] ability to continue in business."  *Id.*  The Secretary's prescribed penalty may not

---

[10] At the time the Secretary assessed the civil penalty against Empire, the maximum statutory penalty for violating the Act was $27,000.00 per violation.  *See* 7 C.F.R. § 3.91(b)(6)(vii) (2008).  Thus, because the complaint alleged (and the Secretary found) five violations of the Act, the Secretary had the authority to assess a maximum $135,000.00 fine.

11

"take priority over or impede the ability of the live poultry dealer to pay any unpaid cash seller or poultry grower." *Id.*

Here, the Secretary did not abuse his discretion in assessing an $18,000.00 civil penalty against Empire. The Secretary appropriately determined that Empire's five violations were significant, and noted that "[w]hen poultry dealers ignore the cash sale payment deadline and defer payments for poultry in order to alleviate cash flow problems or to obtain concessions from sellers, the accumulation of debts to poultry sellers creates the very risk that Congress sought to prevent." (App. at 23A.) The Secretary also correctly determined that a relatively small assessment was appropriate because "Empire's violations involved a small number of transactions with one seller," and "Empire and [Koch] had a dispute over a large number of turkeys that were rejected in one of the shipments." (App. at 24A.) There is no evidence that the $18,000.00 assessment was excessive given the size of Empire's business, or that the penalty would "take priority over or impede" its ability "to pay any unpaid cash seller or poultry grower." 7 U.S.C. § 228b-2(b). Under these circumstances, the imposition of the $18,000.00 assessment was not an abuse of discretion.

## IV.  Conclusion

For the foregoing reasons, we will deny Empire's petition for review.

12